**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190060-U

Order filed April 20, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | Appeal No. 3-19-0060 |
| v. | ) | Circuit No. 14-CF-289 |
| | ) | |
| MARLON COLEMAN, | ) | The Honorable |
| | ) | Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices Lytton and O'Brien concurred in the judgment. _____

_____

**ORDER**

¶ 1    *Held*:  In an appeal in a postconviction-petition case, the appellate court found that the trial court properly summarily dismissed the defendant's postconviction petition in the first stage of proceedings. The appellate court, therefore, affirmed the trial court's judgment.

¶ 2    After a jury trial, defendant, Marlon Coleman, was found guilty of six counts of aggravated driving under the influence of alcohol (aggravated DUI) (625 ILCS 5/11-501(d)(1)(C), (F), (2)(B) (West 2014)) and one count of leaving the scene of a personal injury accident (LTSA) (625 ILCS 5/11-401(a) (West 2014)) and was sentenced to consecutive terms in

prison of 12 years for aggravated DUI (one count) and 4 years for LTSA. On direct appeal, defendant raised only sentencing issues. *People v. Coleman*, 2017 IL App (3d) 150351-U, ¶ 2. This court affirmed defendant's sentence for aggravated DUI but reduced defendant's sentence for LTSA to three years in prison, rather than four. *Id.* ¶ 35. Defendant filed a *pro se* postconviction petition, alleging ineffective assistance of appellate counsel. The trial court summarily dismissed the petition in the first stage of proceedings. Defendant appeals. We affirm the trial court's judgment.

¶ 3                                                    I. BACKGROUND

¶ 4         On April 27, 2014, at around 12:30 a.m., defendant was involved in a fatal traffic accident in Peoria, Illinois. The accident occurred when defendant turned his car, a white Cadillac Deville, in front of a motorcycle driven by Daniel Cantrall that was traveling in the opposite direction, causing Cantrall's motorcycle to crash into defendant's car. Cantrall died at the scene as a result of the injuries he sustained in the collision. Cantrall's wife, Jeniffer Schmitt, who was riding on the back of the motorcycle at the time of the crash, was seriously injured but survived. After the collision occurred, defendant turned into a grocery store parking lot, paused for a moment, and drove away. Defendant was apprehended by the police a short time later with the help of a nearby motorist who had seen the accident, had followed defendant's car, and had boxed defendant's car in at another location until the police arrived.

¶ 5         Defendant was arrested and taken into police custody. About three hours after the accident, the police transported defendant to the hospital for a blood draw. The blood draw was done without defendant's consent and without a search warrant. The blood draw showed that defendant's blood alcohol content was 0.273. Defendant was subsequently charged with six counts of aggravated DUI and one count of LTSA. Some of the aggravated DUI counts alleged

2

that defendant had caused the death of Cantrall; other counts alleged that defendant had caused great bodily harm to Schmitt.

¶ 6        In October 2014, defendant filed a motion to suppress the blood draw evidence, which was later amended.  In the amended motion, defendant asserted that the blood draw violated his federal and state constitutional rights to be protected from unlawful searches and seizures because the blood draw was conducted without a search warrant, consent, or exigent circumstances.  The State opposed the motion to suppress.

¶ 7        In January 2015, a hearing was held on the motion.  The only witness to testify at the hearing was Peoria Police Officer Scott Hulse.  Hulse testified that on April 27, 2014, he was a traffic investigator for the Peoria Police Department.  Hulse had been a Peoria police officer for seven years, had extensive DUI training, and had made numerous DUI arrests.  Hulse was off duty when the accident occurred at about 12:30 a.m. on a Saturday night/Sunday morning and heard the accident call come over the radio.  The accident had taken place in the 1600 to 1700 block of Knoxville Avenue, near a Taco Bell and a Cub Foods.  Because there were no accident-trained traffic officers on duty at that time, Hulse took it upon himself to respond to the scene.

¶ 8        Hulse arrived at the crash site 25 to 30 minutes after the accident had occurred.  The roadway had been blocked off, and the crash site had been secured with crime-scene tape.  Hulse parked in the Cub Foods parking lot and met with some of the supervisors and patrol officers who were at the scene.  Hulse did not remember how many officers were present at the crash site but said there were several.  Hulse examined the crash site and looked for site evidence, such as gouges and tire marks in the roadway.  He also examined the injuries to, and final placement of, Cantrall's body and the final placement of Cantrall's motorcycle.

3

¶ 9    After Hulse had finished his work at the crash site, he responded to a second site on Missouri Avenue, where defendant and his vehicle were located. Officer Irving and Officer White were at the second site. By the time that Hulse arrived at the second location, defendant had already been secured in the back of Irving's squad car. Hulse examined the outside of defendant's car and saw that it had contact damage on the passenger's side, which was consistent with debris that was left at the scene of the crash.

¶ 10    Hulse went over to Irving's squad car and rolled down the window to speak to defendant. When Hulse did so, he noticed that there was an overwhelming odor of alcoholic beverage coming from the back of the vehicle in which defendant was the lone occupant. Hulse asked defendant if he was still living at the address listed on his driver's license. Defendant confirmed that he was and stated, "Man, that guy hit me." As Hulse spoke to defendant, he noticed that defendant's eyes were extremely glassy and bloodshot, that defendant was speaking with a very "thick tongue," that defendant's speech was slow and deliberate, and that defendant seemed confused and somewhat dazed. It was clear to Hulse at that point that defendant was not only under the influence of alcohol, but that defendant was highly intoxicated.

¶ 11    Hulse issued defendant a standard DUI citation, and Officer Irving transported defendant to the Peoria Police Department. Defendant was at the police department for about 45 minutes to an hour. Defendant did not agree to perform filed sobriety tests or to take a breath, blood, or urine test and asked for an attorney. Hulse began to prepare a search warrant for a blood draw from defendant. The last time that Hulse had drafted a blood draw search warrant was about eight years prior. Hulse was about an eighth of the way done drafting the warrant when his supervisor told him that the State's Attorney's Office wanted to talk to him. Hulse contacted one of the Assistant State's Attorneys (ASA) and had a conversation with that ASA about the case.

4

The ASA told Hulse to take defendant to the hospital for a blood and urine draw pursuant to the section 11-501.6 of the Illinois Vehicle Code (625 ILCS 5/11-501.6 (West 2014)).[1] According to Hulse, he did not request a search warrant because the ASA told him that the best course of action at that time was to take defendant to the hospital to get the blood draw process started. Hulse confirmed during his testimony, however, that he did have time to get a search warrant.

¶ 12    After speaking to the ASA, Hulse transported defendant to the hospital for a blood and urine draw. The hospital lobby was fairly full that night, and Hulse had to wait his turn in line, like any other patient. While Hulse was at the hospital with defendant, other officers were mapping the crash site and taking video statements from some of the witnesses. Defendant's blood was drawn by a phlebotomist at the hospital at 3:20 a.m. Defendant did not consent to the procedure and was handcuffed to the hospital bed as the procedure was conducted.

¶ 13    During the course of the hearing, Hulse was questioned in detail about the search warrant process in Peoria County. Hulse indicated that Peoria County did not have a telephone or electronic warrant procedure. Instead, police officers had to put in a written request for a search warrant from a judge. Hulse estimated that in this particular case, it would have taken him about 90 minutes to draft the search warrant. After the search warrant was drafted, Hulse would have had to take the search warrant to an on-call judge, who was available after hours, to have the judge review and sign the warrant. The judge in this particular case resided out of the county, and it would have taken Hulse about 15 minutes to go from the police station to the judge's residence. If the judge signed the search warrant, Hulse would have had to return to the station

---

[1] There was a slight unresolved discrepancy in the trial court between the parties as to the particular section of the Illinois Vehicle Code that was at issue. In his written motion to suppress, defendant referred to section 11-501.2 (625 ILCS 5/11-501.2 (West 2014)) as the applicable statute. However, at the actual hearing on the motion to suppress, Officer Hulse testified that the blood draw was conducted pursuant to section 11-501.6. Both sections refer to the conducting of a blood draw where a personal injury or fatal motor vehicle accident has occurred, and we need not resolve the statutory discrepancy between the parties to resolve the issue presented in this appeal.

to pick up defendant and transport defendant to the hospital. Hulse estimated that it would have taken him about 4½ hours from the time of the accident to get to the hospital with the warrant. Once at the hospital, Hulse would still have had to wait in line to have defendant's blood drawn.

¶ 14 After Hulse's testimony had concluded, the attorneys made their closing arguments on the motion. Defendant's attorney argued that the warrantless blood draw in this case was unconstitutional and cited the United States Supreme Court case of *Missouri v. McNeely*, 569 U.S. 141, 165 (2013), for the proposition that a warrantless nonconsensual blood draw had to be justified under a totality of the circumstances analysis, regardless of any statute that had been written. The State argued that the warrantless blood draw was proper and pointed to the Illinois Supreme Court case of *People v. Jones*, 214 Ill. 2d 187, 199-202 (2005), *abrogation recognized by, People v. Eubanks*, 2019 IL 123525, ¶ 39, for the proposition that a DUI arrestee did not have a right to refuse chemical testing in a fatal or serious injury case under the statute at issue. After considering the evidence and the arguments of the attorneys, the trial court denied defendant's motion to suppress the blood draw evidence. In so doing, the trial court found that the elements of the statute, which allowed for a warrantless nonconsensual blood draw, had been satisfied.

¶ 15 In addition to the motion to suppress, defendant also filed a motion *in limine*, seeking to bar the State's forensic scientist, Elena Kok, from testifying as to the likely range of defendant's blood alcohol content (BAC) at the time of the accident. The State intended to have Kok testify that based upon retrograde extrapolation of defendant's blood test results, defendant's BAC at the time of the accident was between 0.300 and 0.328. Defendant asserted that Kok's opinion in that regard was not reliable because it was based upon assumptions that constituted an insufficient basis for a reliable opinion. The State filed a written response and opposed the motion *in limine*.

¶ 16        In March and April 2015, a jury trial was held in defendant's case. The trial took three days to complete. Defendant was present in court for the trial and was represented by his attorney. The evidence presented at the trial established that just prior to the accident, defendant had been driving in the center turn lane and had been weaving into the lane of oncoming traffic. At the time of the collision, Caleb McConnell, Sharquan Harvey, Brandon Gordon, and Jessica Selph were in vehicles in a nearby Taco Bell drive-through lane. All four witnesses testified at defendant's trial. McConnell saw the Cadillac approaching and weaving into the lane of oncoming traffic. McConnell looked away momentarily and did not see the crash occur. McConnell heard the crash, looked over, and saw the Cadillac drive over a body in the roadway and turn into a grocery store parking lot. McConnell called 9-1-1. Harvey, a passenger in McConnell's vehicle, saw the Cadillac collide head on with a motorcycle. Gordon and Selph heard the crash from their vehicle. Selph looked up and saw a light-colored vehicle bounce over something in the road and turn into a parking lot. Selph and Gordon then saw a motorcycle lying in the road. Selph, who was a nurse, attempted to aid the man and woman who had been riding on the motorcycle. Gordon saw the Cadillac drive away and followed it. Gordon called 9-1-1 as he was driving. Gordon eventually caught up to the Cadillac and pulled out in front of it. Defendant got out of the Cadillac, stumbled, and appeared to be intoxicated. Gordon could smell an odor of an alcoholic beverage on defendant's breath. The police arrived almost immediately thereafter.

¶ 17        One of the police officers who responded to Gordon's location was Peoria Police Officer Jonathan Irving. Irving testified that when he arrived at Gordon's location, which was approximately three to five blocks from the crash site, he saw defendant's Cadillac parked on the wrong side of the street with another vehicle pulled in front of it blocking it in. There were two

7

men (Gordon and defendant) at that location. Irving asked the men who had been driving the Cadillac, and Gordon motioned toward defendant.

¶ 18    Defendant was standing near the front of the Cadillac. He appeared to be confused and not overly aware of his surroundings. Irving ordered defendant to place his hands on the vehicle. Defendant just stood there and stared at Irving. Irving again ordered defendant to put his hands on the vehicle. Defendant complied, and Irving handcuffed defendant. As Irving did so, defendant continued to seem confused and to stare off into space. Irving noticed that defendant's eyes were watery and bloodshot. Irving escorted defendant over to the back of his squad car. As Irving did so, he had to hold defendant up because defendant was swaying while he walked. Irving directed defendant to sit down butt first and to slide back into the squad car. Defendant did not initially comply with Irving's direction and just stood there and stared at Irving. After Irving gave defendant multiple commands to sit down, defendant did so but failed to scoot back, and Irving had to give defendant multiple more commands in that regard. Defendant just sat there and stared at Irving with his feet on the ground outside the vehicle. Another officer had to climb into the other side of the back of Irving's squad car, grab defendant by the shoulders, and scoot defendant into the vehicle further so that the squad-car doors could be secured. At some point, Irving examined the outside of defendant's Cadillac and saw that it had what appeared to be accident-related damage on the passenger's side.

¶ 19    Irving secured defendant in the back of his squad car and stayed on the scene with defendant for approximately an hour-and-a-half before transporting defendant to the police department. While Irving was sitting in his squad car with defendant seated in the back seat, he could smell an odor of alcoholic beverage coming from defendant's breath inside the vehicle. Defendant stated to Irving, "That guy hit me." When defendant spoke, Irving noticed that

8

defendant's speech was "somewhat slurred," but "mainly just slow and kind of rambling." Irving confirmed during his testimony that at the time he took defendant into custody, he believed defendant was intoxicated. A portion of Irving's squad-car video was played for the jury. The video showed defendant seated in the back of Irving's squad car randomly talking and mumbling to himself that the other driver had struck his vehicle.

¶ 20 Two other Peoria police officers who observed defendant after the crash had occurred testified that defendant appeared to be intoxicated. One of those officers was Officer Scott Hulse, the officer who had testified at the hearing on defendant's motion to suppress the blood draw evidence. Hulse's testimony at defendant's jury trial was generally similar to the testimony that he had given at the suppression hearing. Most notably, Hulse again testified that he initially encountered defendant a short time after the crash at the location on Missouri Avenue where Officer Irving had defendant secured in the back of his squad car, that there was an overwhelming odor of alcoholic beverage coming from the squad-car area where defendant was located, that defendant's eyes were very bloodshot and glassy, that defendant's speech was slow and very deliberate, that defendant spoke with a "thick tongue," that defendant seemed a little dazed, that defendant was very unsteady on his feet when the officers escorted defendant into the hospital for a blood draw, and that he believed defendant was intoxicated. Hulse confirmed during his trial testimony that defendant was in police custody from shortly after the crash until the time defendant's blood was drawn and that defendant was not permitted to drink alcohol or eat during that time period.

¶ 21 The other officer was Officer Brett Vonderheide. Shortly after the crash occurred, Vonderheide responded to the crash site and collected the vehicle parts that had been left at the site as a result of the collision. After doing so, Vonderheide later compared those parts to

9

defendant's vehicle. All of the damage to defendant's vehicle was on the passenger's side. Vonderheide was able to match the broken parts collected from the scene to defendant's vehicle and to the part numbers from the manufacturer of defendant's vehicle. Vonderheide did not find any vehicle parts at the crash site that were inconsistent with defendant's vehicle.

¶ 22     In addition to collecting the parts at the crash site, at about 4:20 a.m. on the morning of the crash, Vonderheide assisted Officer Hulse in escorting defendant back into the police station after defendant had gone to the hospital. Defendant seemed to be wobbly and off-balance, and Vonderheide could immediately smell a strong odor of alcoholic beverage coming from defendant's breath. Once inside the station, defendant went to sit down on a bench and "kind of fell against the wall on his left side and kind of slid down the wall as he seated." Vonderheide believed that defendant was intoxicated.

¶ 23     Kristin Locke, the nurse who drew defendant's blood at the hospital, testified about the procedure she followed and about her observations of defendant that morning. Locke noticed that defendant was a little bit wobbly and that his speech was slurred and believed that defendant was intoxicated.

¶ 24     At the end of the second day of defendant's jury trial, the trial court and the attorneys had a discussion about defendant's motion *in limine*. After listening to the arguments of the attorneys, the trial court indicated that it was inclined to admit Kok's extrapolation testimony, subject to cross-examination, but that it would hold off ruling upon the issue to allow defense counsel the opportunity to *voir dire* Kok and to make an offer of proof. The following day, before the trial resumed, the prosecutor told the trial court that she had discussed the matter with defense counsel, that the State would not introduce the testimony regarding extrapolation, and that the State would merely have Kok testify that the result of defendant's blood alcohol test was

10

0.273. Defendant informed the trial court that it was going to object to the admission of the blood alcohol test results, that expert testimony on retrograde extrapolation was necessary to explain the effect of the passage of time on defendant's BAC, and that introducing the blood alcohol test results without extrapolation would be prejudicial. The prosecutor disagreed. During the discussion, the trial court indicated to the attorneys that although the jury would be told the results of the blood alcohol test, the attorneys would not be able to make any statement in closing argument as to what those results meant with regard to defendant's BAC at the time of the accident because no expert testimony in that regard was going to be presented. Based upon its discussion with the attorneys, the trial court concluded that a ruling on defendant's motion *in limine* was no longer necessary. Kok later testified for the State that defendant's BAC was 0.273.

¶ 25        During the trial, after all the evidence had been presented and the attorneys had made their closing arguments, the trial court instructed the jury on the law. One of the instructions that the trial court gave the jury was that if the jury found beyond a reasonable doubt that defendant's BAC was 0.08 or more at the time defendant drove a vehicle, the jury could presume that defendant was under the influence of alcohol (see Illinois Pattern Jury Instructions, Criminal, No. 23.30 (approved Dec. 8, 2011)). The trial court instructed the jury further, however, that it was never required to make that presumption and that it was for the jury to determine whether that presumption should be drawn (see *id.*).

¶ 26        At the conclusion of the trial, the jury found defendant guilty of all six counts of aggravated DUI and of the one count of LTSA. Defendant filed a posttrial motion for judgment notwithstanding the verdict or for new trial and claimed, among other things, that the trial court erred in allowing the results of defendant's blood alcohol test to be admitted without any

11

extrapolation evidence being presented (the admission issue).  Defendant also filed a posttrial motion to reconsider and claimed that the trial court erred in denying defendant's motion to suppress the blood draw evidence (the suppression issue).  Following a hearing, the trial court denied defendant's posttrial motions.  The trial court subsequently sentenced defendant to consecutive terms in prison of 12 years on one of the aggravated DUI counts and 4 years on the LTSA count.  Defendant filed a motion to reconsider sentence, which the trial court denied.

¶ 27  On direct appeal, the only issues raised by defendant were sentencing issues.  *Coleman*, 2017 IL App (3d) 150351-U, ¶ 2.  This court affirmed defendant's sentence for aggravated DUI but reduced defendant's sentence on the LTSA conviction to three years in prison, instead of four.  *Id.* ¶ 35.

¶ 28  In May 2018, defendant filed the instant *pro se* postconviction petition.  Among other things, defendant alleged in the petition that his appellate counsel was ineffective for failing to raise in the direct appeal the suppression and admission issues.  The trial court summarily dismissed defendant's petition in the first stage of proceedings.  Defendant filed a motion to reconsider, which the trial court either dismissed or denied.[2]  Defendant filed a late notice of appeal, which this court allowed.

¶ 29                                   II. ANALYSIS

¶ 30  On appeal, defendant argues that the trial court erred in summarily dismissing his *pro se* postconviction petition in the first stage of proceedings.  Defendant asserts that his petition

_____

[2] In August 2018, defendant filed a timely notice of appeal to challenge the trial court's summary dismissal of his postconviction petition.  In September 2018, defendant filed his motion to reconsider.  In November 2018, the trial court addressed the motion to reconsider in a written order.  The trial court initially found that it lacked jurisdiction to rule upon the motion because defendant had already filed an appeal and dismissed the motion to reconsider for that reason.  The trial court indicated in the order, however, that in the alternative, if it had jurisdiction, it was denying the motion to reconsider on the merits.  This court later granted defendant's motion to dismiss his appeal as premature and allowed defendant to file a late notice of appeal.

12

should not have been dismissed because the petition was sufficient to make at least an arguable claim that defendant had received ineffective assistance of appellate counsel in his direct appeal. In support of that assertion, defendant contends that: (1) given the evidence presented at the suppression hearing and the trial and the applicable law on when a warrantless nonconsensual blood draw may be validly conducted in a DUI case, it was at least arguable that the trial court's ruling on the suppression issue was erroneous and that this court would have reversed that ruling on direct appeal if appellate counsel had raised that issue; (2) based upon the facts of this case, the applicable law on whether extrapolation evidence must be presented for a later blood test result to be admitted in a DUI case, and the applicable law on whether expert testimony must be presented to explain extrapolation evidence to a jury, it was at least arguable that the trial court's ruling on the admission issue was erroneous and that this court would have reversed that ruling on direct appeal if appellate counsel had raised that issue; and (3) defendant's postconviction petition was sufficient, therefore, to establish both an arguable claim that appellate counsel's performance was deficient in failing to raise the suppression and admission issues in the direct appeal and an arguable claim that defendant was prejudiced by that deficient performance. For those reasons, defendant asks that we reverse the trial court's summary dismissal of defendant's postconviction petition and that we remand this case for second stage proceedings.

¶ 31     The State argues that the trial court's ruling was proper and should be upheld. The State asserts that defendant's postconviction petition raised only nonmeritorious issues and was, therefore, correctly dismissed in the first stage of proceedings. More specifically, the State contends that: (1) appellate counsel's performance was not arguably deficient for deciding not to raise the suppression issue on direct appeal since the facts of this case and the controlling law in effect at the time of the direct appeal on when a warrantless nonconsensual blood draw may be

13

validly conducted in a DUI case supported the trial court's denial of the motion to suppress; (2) appellate counsel's performance was not arguably deficient in failing to raise the admission issue on direct appeal since defendant was the one in the trial court who had invited the alleged admission error by seeking to exclude the extrapolation evidence; (3) invited error aside, appellate counsel's performance was not arguably deficient for failing to raise the admission issue on direct appeal since this court's own ruling established that extrapolation evidence was not required under the circumstances of the present case for the blood test results to be admitted and since there was ample other evidence of defendant's intoxication to support the jury's finding that defendant's BAC at the time of the accident was 0.08 or greater; and (4) defendant was not arguably prejudiced by the alleged deficient performance of appellate counsel on direct appeal since defendant's underlying claims (the suppression and admission issues) were without merit. For those reasons, the State maintains that defendant's postconviction petition failed to establish both an arguable claim that appellate counsel's performance on direct appeal was deficient and an arguable claim that defendant was prejudiced by that alleged deficient performance. The State asks, therefore, that we affirm the trial court's summary dismissal of defendant's postconviction petition.

¶ 32    The Post-Conviction Hearing Act (Act) establishes a procedure for an imprisoned criminal defendant to collaterally attack his conviction or sentence based upon a substantial violation of federal or state constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2018); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). In the first stage of proceedings under the Act, the trial court has 90 days to independently review the postconviction petition, taking the allegations as true, and to determine whether the petition is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018); *Hodges*, 234 Ill. 2d at 10. A petition is frivolous or patently without merit only if it

14

has no arguable basis either in law or in fact. *Hodges*, 234 Ill. 2d at 11-12. A petition lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as one that is completely contradicted by the record. *Id.* at 16. A petition lacks an arguable basis in fact if it is based upon a fanciful allegation, such as one that is clearly baseless, fantastic, or delusional. *Id.* at 16-17. If the trial court finds in the first stage of proceedings that the petition is frivolous or patently without merit, it shall summarily dismiss the petition in a written order. See 725 ILCS 5/122-2.1(a)(2) (West 2018); *Hodges*, 234 Ill. 2d at 10. Such a dismissal is subject to *de novo* review on appeal (*Hodges*, 234 Ill. 2d at 9) and may be affirmed on any basis supported by the record (see *People v. Little*, 335 Ill. App. 3d 1046, 1051 (2003)).

¶ 33     A claim of ineffective assistance of counsel is analyzed under the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted in Illinois in *People v. Albanese*, 104 Ill. 2d 504, 525 (1984). *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To succeed on a claim of ineffective assistance of counsel under the *Strickland* test, a defendant must show: (1) that defense counsel's performance was deficient; and (2) that defendant suffered prejudice as a result of the deficient performance. *Id.* To satisfy the second prong of *Strickland*, a defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 496-97. If a claim of ineffective assistance of counsel can be disposed of under the prejudice prong, there is no need to determine whether counsel's performance was deficient. *Albanese*, 104 Ill. 2d at 527.

¶ 34     The *Strickland* test also applies to claims of ineffective assistance of appellate counsel. *Petrenko*, 237 Ill. 2d at 496; *People v. Johnson*, 205 Ill. 2d 381, 405 (2002). A defendant who claims that appellate counsel was ineffective must show that appellate counsel's failure to raise an issue on appeal was objectively unreasonable and that appellate counsel's decision in that

regard prejudiced the defendant. *Johnson*, 205 Ill. 2d at 405-06. Normally, appellate counsel's decision regarding what issues to pursue is entitled to substantial deference. *Id.* at 406. Appellate counsel is not required to brief every possible issue and may refrain from developing nonmeritorious issues without violating *Strickland* because the defendant suffered no prejudice unless the underlying issue is meritorious. *Id.* As a result, the prejudice question requires the reviewing court to examine the merits of the claims not raised by appellate counsel. *Id.* In the first stage of postconviction proceedings, a petition alleging ineffective assistance of appellate counsel may not be summarily dismissed if it is arguable that appellate counsel's performance fell below an objective standard of reasonableness and it is arguable that that the defendant was prejudiced thereby. *Petrenko*, 237 Ill. 2d at 497.

¶ 35    In the present case, after having reviewed the record, we find that the trial court properly dismissed defendant's *pro se* postconviction petition in the first stage of proceedings. Contrary to defendant's assertion on appeal, defendant's postconviction petition failed to establish an arguable claim of ineffective assistance of appellate counsel because defendant's petition failed to establish an arguable claim that defendant had been prejudiced by appellate counsel's alleged deficient performance. See *Albanese*, 104 Ill. 2d at 525-27; *Johnson*, 205 Ill. 2d at 405-406; *Petrenko*, 237 Ill. 2d at 497. Indeed, the evidence of defendant's intoxication in this case was so overwhelming that even if appellate counsel had raised the two alleged errors cited by defendant, the result of the appeal would not arguably have changed and defendant's convictions would still have been upheld. The evidence presented at the trial in the instant case showed that the accident had occurred on a Saturday night/Sunday morning shortly after midnight; that immediately prior to the accident, defendant had been driving in the center turn lane and weaving into the lane of oncoming traffic; that the accident had occurred when defendant had turned his vehicle in front

16

of an oncoming motorcycle; that police officers, a civilian witness, and a nurse who had encountered defendant immediately after the accident had occurred or some time thereafter observed defendant to have several of the indicia of intoxication and believed that defendant was intoxicated at the time; and that a police video taken after the accident had occurred showed defendant in the back of the squad car talking and mumbling to himself that the other driver had struck his vehicle. Based upon the overwhelming evidence of defendant's intoxication in this case, we find that defendant's postconviction petition failed to establish an arguable claim that he was prejudiced by appellate counsel's alleged deficient performance. See *Albanese*, 104 Ill. 2d at 525-27; *Johnson*, 205 Ill. 2d at 405-406; *Petrenko*, 237 Ill. 2d at 497. The trial court, therefore, properly dismissed defendant's *pro se* postconviction petition in the first stage of proceedings. See 725 ILCS 5/122-2.1(a)(2) (West 2018); *Hodges*, 234 Ill. 2d at 10. Having so concluded, we need not determine whether defendant's postconviction petition established an arguable claim that appellate counsel's performance was deficient. See *Albanese*, 104 Ill. 2d at 527.

¶ 36                                    III. CONCLUSION

¶ 37        For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 38        Affirmed.

17